670 So.2d 515 (1996)
STATE of Louisiana
v.
Kenneth CAIN, et al.
No. 95-K-0054.
Court of Appeal of Louisiana, Fourth Circuit.
February 27, 1996.
Writ Denied May 3, 1996.
*516 Harry F. Connick, District Attorney, Richard Olivier, Assistant District Attorney, Paul Fleming, Jr., Law Clerk, New Orleans, for Relator.
Ronald J. Rakosky, A Professional Law Corporation, New Orleans, for Respondents.
Before SCHOTT, C.J., and ARMSTRONG and MURRAY, JJ.
MURRAY, Judge.
This criminal prosecution involves nine defendants who allegedly were part of a drug trafficking organization headed by Kenneth Cain. In April 1993, New Orleans police detectives began an investigation of the alleged organization based upon information from three confidential informants, all of whom were known to be credible and reliable. The informants identified the Soap Box Laundry Mat, a business owned by Mr. Cain, and residences at 5603 and 5710 Dauphine Street as drug outlets. These informants also identified various people as members of the Cain organization. Several controlled drug purchases were made by informants at the Soap Box and at 5603 Dauphine, and negotiations for undercover drug sales took place at the Soap Box and 5710 Dauphine Street. Additionally, direct surveillance revealed suspicious activities at the various locations.
In November 1993, Sergeant Bruce Harrison sought and obtained an order for a pen register[1] for a telephone at the Soap Box, and additional pen registers were later placed on other phones belonging to Mr. Cain, his mother and sister. With information recorded from these registers, Sgt. Harrison applied for and was granted full wire intercepts.[2] Search warrants for the business and various residences eventually were obtained based on information from the pen *517 registers and wiretaps as well as from surveillance. With this evidence, this prosecution for various offenses related to distribution of heroin and cocaine was instituted.
The defendants filed motions to suppress the evidence obtained by the police. The trial court made a variety of rulings as to the pen registers, wiretaps, and warrants. The State applied for supervisory writs as to all rulings adverse to it. This Court ordered the matter set on the docket and also allowed the defense to file a cross-application regarding all rulings adverse to the defendants. All of the issues raised by the applications are essentially res nova in Louisiana.
We grant the writ to review the rulings of the trial court, which are affirmed in part and reversed in part.

PEN REGISTERS:
We will first deal with the trial court's ruling on the use of the evidence obtained through pen registers approved for the following numbers: XXX-XXX-XXXX (Soap Box Laundry); XXX-XXX-XXXX (residence of defendant Jean Cain); and XXX-XXX-XXXX (the residence of an individual not prosecuted in this case).
The court found that some applications for pen registers on these three numbers were defective because they did not include a recitation of facts or an oath or equivalent affirmation by the presenting officer as required by the relevant statutes. The court excluded all evidence obtained from these pen registers.
Pen registers and trap and trace devices are regulated by La.Rev.Stat.Ann. § 15:1313-1316. Section 1314 of that Act, which regulates the application for an order for a pen register or trap and trace device, provides as follows:
A. An investigative or law enforcement officer may make application for an order or an extension of an order under R.S. 15:1315 to a court of competent jurisdiction authorizing or approving the installation and use of a pen register or a trap and trace device under this Part, in writing under oath or equivalent affirmation, to a court of competent jurisdiction of this state.

* * * * * *
B. An application made pursuant to this Section shall include:
(1) The identity of the investigative or law enforcement officer making the application and the identity of the law enforcement agency conducting the investigation.
(2) A certification by the applicant attesting that the information sought is relevant to an ongoing felony criminal investigation being conducted by that agency, and includes in that certification a recital of facts or information constituting the reasonable suspicion upon which the application is based.[3]
(Emphasis added.)
The State argues that § 15:1314B(2) should be analogized to an investigatory stop under La.Code Crim.Proc.Ann. art. 215.1, which allows a law enforcement officer to stop a person in a public place whom he reasonably believes is committing, has committed, or is about to commit an offense. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Matthews, 94-2112 (La.App. 4th Cir. 4/26/95), 654 So.2d 868; State v. Johnson, 557 So.2d 1030 (La. App. 4th Cir.1990). As this Court noted in Johnson:
`Reasonable suspicion' is something less than the probable cause required for an arrest, and the reviewing court must look to the facts and circumstances of each case to determine whether the detaining officer had sufficient facts within his knowledge to justify an infringement of the suspect's rights. State v. Jones, supra [483 So.2d 1207 (La.App.1986)]. Mere suspicion of activity is not a sufficient basis for police interference with an individual's freedom. State v. Williams, 421 So.2d 874 (La.1982).
Id. at 1033.
To analogize between an investigatory stop under Article 215.1 and an application for a *518 pen register is logical considering that both refer to a standard of "reasonable suspicion" and the need for facts articulated by the police officer. The critical difference between the two, of course, is that in order to obtain a pen register, an officer must articulate, in a prior application before a judge, the facts sufficient to form "reasonable suspicion."
The State argues that Sgt. Harrison stated sufficient facts in the first three pen register applications; the trial court held that he did not. The application contained the following recitation of facts:
Applicant certifies that the Narcotics Section of the Orleans Police Department is conducting a criminal felony investigation of Kenneth Cain and others yet unknown in connection with possible violations of L.R.S. Title 40, Article 967; that it is believed that the subjects of this investigation are using telephone number XXX-XXX-XXXX subscribed to Soap Box Laundry Mat located at 5400 Saint Claude Avenue, New Orleans, Louisiana, in furtherance of the subject offenses; and that the information likely to be obtained form (sic) the pen register is relevant to the ongoing criminal investigation in that it is believed that this information will concern the aforementioned offenses. [Emphasis in original.]
The allegations in this paragraph are devoid of any facts or information regarding the basis of Sgt. Harrison's belief that the subjects of the ongoing investigation were using the telephone in furtherance of criminal activity. Instead, the above paragraph appears to be drafted to comply with the federal statute, 18 U.S.C. § 3122(b)(2), which requires only a certification that the information to be obtained is relevant to the criminal investigation. La.Rev.Stat.Ann. § 15:1314B requires more. Therefore, the trial court was correct when it determined that the allegations in the first three pen register applications for the Soap Box Laundry, were not sufficient.
The trial court also excluded information obtained from the first three pen registers on the grounds that the applications did not include an oath or equivalent affirmation as required by the statute. The State argues that there was an equivalent affirmation because there was an attestation clause stating "I [Sergeant Harrison] declare under penalty of perjury that the forgoing [sic] is true and correct and that the below signature is that of the Superintendent of Police." The application is not signed by the judge or by a notary.
There is very little jurisprudence on what constitutes an "oath or equivalent affirmation." In considering this issue the Supreme Court stated:
While this court has never passed upon the formality required to constitute a declaration under oath, it has been generally held that to constitute a valid oath, there must be, in the presence of a person authorized to administer it, an unequivocal act by which the affiant consciously takes on himself the obligation of an oath. It is sufficient that both the person swearing and the officer administering the oath understand that what is done is proper for the administration of the oath and all that is necessary to complete the act of swearing. We agree with this generally accepted rule of law. (Footnote omitted.)
State v. Snyder, 304 So.2d 334, 336 (La.1974).
In Snyder, the Court found that an "oath" could be written but must be done in front of an appropriate official. In Neely v. State, Dept. of Safety, 308 So.2d 880 (La.App. 2nd Cir.1975), the suspension of a license under the DWI statute was found to be improper because the report of the law enforcement officer was not properly sworn. The officer had signed the form which included a declaration that it was under oath, but the officer had not appeared before the notary, although the notary had signed it on a separate occasion. In comparison, in Gunstream v. State, Dept. of Public Safety, 353 So.2d 355 (La. App. 1st Cir.1977), the court found a sufficient oath where the officer signed the oath clause and then appeared before the notary and affirmed his signature.[4]
*519 In the instant case, there is no evidence that Sgt. Harrison ever affirmed his signature before a person authorized to administer an oath. The State could have placed Sergeant Harrison on the stand to testify that he had affirmed his signature, if in fact he had done so, but it did not.[5] Therefore, the trial court correctly held that the first three applications for pen registers at the Soap Box Laundry did not comply with the statutory requirement that they be done under "oath or equivalent affirmation."
Having determined that the applications for these pen registers did not comply with the procedures specified in the statute, we consider the trial court's exclusion of evidence obtained by the use of those pen registers.
The Act does not include a specific exclusionary rule for violating the statutory requirements for obtaining a pen register, although it does include a specific exclusionary rule in connection with the issuance of wiretap warrants. La.Rev.Stat.Ann. § 15:1307A.[6] The question raised, therefore, is whether failure to comply with the statutory requirements for obtaining a pen register necessitates the exclusion of evidence obtained from the pen register.
The Supreme Court has held that there is no constitutionally protected right to privacy with regard to the numbers dialed from one's phone, so that a pen register does not constitute a search. Smith v. Maryland, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).[7] Congress enacted the federal pen register statute, 18 U.S.C. § 3121-3127, in response to Smith to provide a procedure for the installation and use of pen registers. Unlike the federal wiretap act, the federal pen register act does not provide for exclusion of evidence from a pen register that was installed without compliance with the statutory requirements for obtaining a pen register. For these reasons, federal jurisprudence has consistently held that failure to comply with the applicable statutory requirements for obtaining a pen register order does not require exclusion of evidence obtained from the pen register. See United States v. Thompson, 936 F.2d 1249 (11th Cir.1991), cert. denied, 502 U.S. 1075, 112 S.Ct. 975, 117 L.Ed.2d 139 (1992).
Additionally, at least one state has held that failure to comply with the statutory requirements for a pen register order does not require exclusion of the evidence despite the fact that the state's statutory requirements were more stringent than those in the federal statute. See State v. Fakler, 503 N.W.2d 783 (Minn.1993). The Minnesota statute, which as originally enacted was based directly upon the federal statute, was amended in 1989 to include a requirement that the officer applying for the order include "a statement of the facts and circumstances relied upon by the applicant to justify the applicant's belief that an order should be issued." Minn.Stat. § 626A.36 (1990); Fakler *520 at 786. Although this language does not include a finding of reasonable suspicion as the Louisiana statute does, it does requires more than the federal statute. Nevertheless, as a matter of first impression, the Minnesota Supreme Court held in Fakler that failure to provide the issuing court with sufficient facts did not require exclusion because there was no specific statutory sanction and because the officer applying for the order actually had sufficient information but had not included it in the application. Id. at 788.
Considering that the Supreme Court has held that a pen register does not implicate privacy rights under the Fourth Amendment of the United States Constitution, refusal to exclude the evidence will not violate that constitution or any existing Louisiana statute. The only remaining question to be considered is whether the use of evidence obtained from a pen register obtained without compliance with the statutory requirements would violate Article 1, § 5 of the Louisiana Constitution of 1974 which provides:
Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.
As was noted in State v. Daniels, 93-1769, p. 2 (La.App. 4th Cir. 1/27/94), 631 So.2d 1281, 1283:
Louisiana enjoys the distinction of having a specifically denominated and defined constitutional right to privacy. The Louisiana Supreme Court recognized that:
Article 1, Section 5, of the Louisiana Constitution of 1974 protects against unreasonable searches, seizures and invasions of privacy. This declaration of rights does not duplicate the Fourth Amendment [to the United States Constitution]. It represents a conscious choice by the citizens of Louisiana to give a `higher standard of individual liberty than that afforded by the jurisprudence interpreting the federal constitution.' State v. Hernandez, 410 So.2d 1381, 1385 (La.1982). State v. Church, 538 So.2d 993 (La.1989).
The Louisiana Supreme Court acknowledged the distinction between the federal and state constitutions most recently in State v. Tucker, 626 So.2d 707, 712 (La.1993), when it found that a determination of when a seizure occurs under the Fourth Amendment to the U.S. Constitution, as stated in California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547 (1991), afforded less protection than the Louisiana Constitution.
Article 1, § 5 of the Louisiana Constitution specifically protects a person's right to be free from unlawful governmental intrusion "in his person, property, communications, houses, papers, and effects." A pen register, which simply records and decodes electronic impulses to identify numbers dialed from a particular phone, is not a communication. It is much less intrusive than a wiretap, a fact that the legislature implicitly recognized when it enacted an exclusionary rule for wiretap violations but not pen registers.
We find, therefore, that there is no statutory or constitutional basis to require exclusion of evidence gathered from a pen register that was authorized without compliance with La.Rev.Stat.Ann. § 15:1314. We recognize that there is little incentive for law enforcement officials to comply with the procedural requirements for obtaining authorization for a pen register when there is no sanction for the failure to comply. However, absent a constitutionally protected privacy interest with regard to the numbers dialed from one's home, it is for the legislature to determine what, if any, consequence will flow from the failure to comply with the procedures it has established for obtaining a pen register.
The trial court excluded the evidence from the pen register on the phone installed at Jean Cain's residence as the "fruit of the poisonous tree." Because we find that there is no exclusionary rule for failure to comply with the statutory requirements relating to *521 pen registers, we reverse the trial court's exclusion of evidence on this basis, and pretermit discussion of the other procedural deficiencies raised by the defense in its writ application.[8]

WIRETAPS:
Three sets of wiretaps are at issue in this case: (1) a wiretap on the phone at the residence of Jean Cain; (2) an original and renewal wiretap on the phone at the Soap Box Laundry; and (3) a wiretap on a phone located at 3341 N. Rampart Street.[9]
The defense argued that all of these wiretaps were improperly authorized because the State failed to comply with the requirements of La.Rev.Stat.Ann. § 15:1308A in that the applications for the wiretaps were approved by assistants rather than the Attorney General and District Attorney. Additionally, the defense asserted that since the wiretap evidence had not been sealed immediately, as required by La.Rev.Stat.Ann. § 15:1310F(1), its use in this prosecution is prohibited.
The trial court rejected the defense argument regarding the authority of the assistants approving the wiretap applications. It found, however, that the wiretap evidence had not been sealed immediately upon termination of the wiretap, as required by the statute, and that there was no reasonable explanation for the delay. The court therefore excluded all of the evidence obtained via the wiretaps on all three phones.
In reaching this decision, the trial court relied on United States v. Ojeda Rios, 495 U.S. 257, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990), in which the United States Supreme Court addressed the failure to comply with the sealing requirement of the federal Wiretap Act, 18 U.S.C. § 2518(8)(a), which requires that wiretap recordings shall be made available to the judge issuing the wiretap order and sealed under his directions. The Act also provides that "[t]he presence of the seal ... or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom...." The Court determined that the requirement for an immediate seal was viewed by Congress as important because it limited the government's ability to tamper with the recordings. For this reason, it held that failure to comply with the statutory requirement that the recorded contents of the interception must be immediately sealed, unless the government provided a satisfactory reason for any delay, would result in suppression of the evidence. Ojeda Rios at 265, 110 S.Ct. at 1850.[10]
Following the Supreme Court's pronouncement in Ojeda Rios, failure to comply with the federal statute's sealing requirement will result in suppression of evidence obtained from the wiretap unless the government provides a satisfactory explanation for the delay. Determining whether the explanation offered is satisfactory requires a two-pronged inquiry: "first, whether the proffered explanation was the actual reason for the delay; second, whether it is objectively reasonable." United States v. Vastola, 989 F.2d 1318, 1325 (3rd Cir.1993).
The Louisiana Electronic Surveillance Act., La.Rev.Stat.Ann. § 15:1310F(1), which is virtually identical to the federal Wiretap Act examined in Ojeda Rios, provides in pertinent part that:
The recording of the contents of any wire or oral communication under this Subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration *522 of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recording shall be wherever the judge orders.... The presence of the seal provided for by this Subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or evidence derived therefrom under R.S. 15:1309(C).
In the instant matter, the State contends that the tapes were sealed immediately, although not under the direction of the judge as required by the statute.[11] The State argues that this immediate sealing protected the integrity of the evidence, and thus satisfied the legislative intent behind the sealing requirement, so that suppression is not required. This is the argument that was rejected in Ojeda Rios.[12]
As the trial court noted, "[t]he law seems to state very specifically that it has to be done under the direction of the Court." Rev. Stat.Ann. § 15:1310F(1) provides that "[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." (Emphasis added.) This statutory language makes it clear that the sealing required by the statute is to be done under the direction of the issuing judge, not simply by the police officers involved.[13] The trial court correctly determined that the State had not complied with the sealing requirement.
The State's alternative argument is that under Ojeda Rios it has a satisfactory explanation for the sealing delays. The State contends that the delay in bringing the tapes before the judge was caused by "a misunderstanding of the statute by the narcotics detectives." The State argues that the wiretap statute is long, complex, contains no annotations, and that police officers "are not trained to make complex, legal analyses such as this." The trial court found that the State failed to advance any explanation, satisfactory or otherwise, for the delay.
Ojeda Rios requires that the actual reason for the delay be given. In order to be deemed a satisfactory reason for the delay, the reason must be objectively reasonable and must have been "relied on at the suppression hearing to explain the sealing delays." Id. at 267, 110 S.Ct. at 1851. The prosecutor in Ojeda Rios had relied on Second Circuit case law holding that an extension of a wiretap obtained on an untimely basis could still be deemed a valid extension so long as it was part of the same ongoing investigation. The government attorney had assumed from these cases that the sealing requirement did not come into play until there was a meaningful break in the investigation as a whole. The Ojeda Rios Court found that the prosecutor's belief was objectively reasonable at the time of the delays, although legally incorrect. Id.
Similarly, in United States v. Carson, 969 F.2d 1480 (3rd Cir.1992), the prosecutor's erroneous belief that an order obtained within thirty days of the expiration of the prior order qualified as an extension was found to be an objectively reasonable explanation. The Court noted that the government attorney *523 had read the statute, case law, and had started the sealing procedure within thirty days, although more than ten days after the expiration of the prior order. The Court stated that "[h]e was mistaken, but Ojeda Rios makes it clear that pre-Ojeda Rios mistakes of law regarding when sealing is required will not be grounds for suppression." Id. at 1493.
We assume for the purposes of this writ application that the actual reason for the delay was that given by the prosecutor at the suppression hearing:
Judge, to respond, the misunderstanding or the excuse that the State or the Government gives is that I was under the misunderstanding that the sealing order or having the judge sign that piece of paper related more to the disclosure. There is also in the sealing orders a request that the judge not notify the targets of the wire intercept. I believe the Court is aware that there is a notification requirement that kicks in. I thought at that time it was about 150 days, but it is more like 90 days when that kicks in.
The issue we must decide is whether this explanation was objectively reasonable so as to bring this wiretap evidence within the exception to the statute's exclusionary rule.
In order for a mistake of law, such as the State advances as its explanation for the delay in this case, to be objectively reasonable, the prosecutor must have "acted as a `reasonably prudent' attorney would to investigate the legal question involved in a reasonably prudent manner." Carson at 1493. In this case, the disclosure portion of the statute referred to by the prosecutor in his statement to the trial court is contained in La. Rev.Stat.Ann. § 15:1310F(4). It is independent of the sealing requirement found in § 15:1310F(2). A review of the applicable statute would have shown that the sealing requirement is immediate, whereas the disclosure requirement comes into play in ninety days. And even the most rudimentary research would have led to Ojeda Rios and its pronouncements relative to the identical sealing requirement in the federal statute.
The State suggests that this entire matter should be remanded to allow the court to hold a hearing and to determine the reasonableness of the delay. However, a hearing was held at which all of the parties and the court extensively discussed the burden on the State to present its explanation for the delay. The State is not entitled to a second bite at the apple; it may not "present new reasons for sealing delays when it has already given a reason for delay at the suppression hearing." Carson at 1493.
The trial court correctly concluded that the State failed to have the tapes sealed timely by the judge as required by the statute and failed to provide a satisfactory explanation for the delay. Therefore, as required by La.Rev.Stat.Ann. § 15:1310F(1), the contents of all communications obtained from the wiretaps and all evidence derived therefrom was properly suppressed.[14] For this reason, we need not address the defense's argument relative to suppression of the wiretap evidence based on a procedural defect in the wiretap applications.

SEARCH WARRANTS:
The final issues raised by these writ applications pertain to the trial court's rulings on suppression of evidence derived from five search warrants. The warrants for the Soap Box Laundry (5400 St. Claude Avenue), 5603 and 5710 Dauphine Street, and 3341 N. Rampart Street were based upon a single affidavit (affidavit "A"); the warrant for 1925 Benton Street was based on a separate affidavit (affidavit "B"). The trial court granted the defense motion to suppress evidence seized from 5603 and 5710 Dauphine Street and 3341 N. Rampart Street, but denied it as to evidence seized from 5400 St. Claude and 1925 Benton Street. These rulings were *524 based upon the court's evaluation of the supporting affidavits after it had excised any information derived from the suppressed wiretaps and pen registers.[15] Both the State and the defense complain of the rulings which are adverse to them.
The trial court marked a copy of affidavit "A", which is attached hereto as Appendix A. A review of this marked affidavit shows that the trial court excised any information that came directly from the wiretaps, i.e., recounting of taped conversations, but retained information from direct surveillance or from drug sales to a confidential informant or undercover officer.
In State v. James, 581 So.2d 349 (La.App. 4th Cir.1991), this court set out the standard of review of the issuance of a search warrant:
C.Cr.P. art. 162 provides that a search warrant may be issued "only upon probable cause established to the satisfaction of the judge, by the affidavit of a credible person, reciting facts establishing the cause for the issuance of the warrant." The Louisiana Supreme Court has held that probable cause exists when:
the facts and circumstances within the affiant's knowledge, and those of which he has reasonably trustworthy information, are sufficient to support a reasonable belief that evidence [or] contraband may be found at the place to be searched.

State v. Duncan, 420 So.2d 1105 (La.1982). See also State v. Roebuck, 530 So.2d 1242 (La.App. 4th Cir.), writ denied 531 So.2d 764 (La.1988); State v. Scott, 499 So.2d 1248 (La.App. 4th Cir.1986). The facts which form the basis for probable cause to issue a search warrant must be contained "within the four corners" of the affidavit. Duncan; Roebuck. A magistrate must be given enough information to make an independent judgment that probable cause exists for the issuance of the warrant. State v. Manso, 449 So.2d 480, 482, (La.1984), cert. denied, Manso v. Louisiana, 469 U.S. 835, 105 S.Ct. 129, 83 L.Ed.2d 70 (1984).
In its review of a magistrate's finding of probable cause, the appellate court must determine whether the "totality of circumstances" set forth in the affidavit is sufficient to allow the magistrate
to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband ... will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclu[ding] that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238-39, 103 S.Ct. 2317 [2332, 76 L.Ed.2d 527] (1983). (citations omitted)
See also Manso; Roebuck.

James at 353-54.[16]
The State contends that even after excising information obtained directly from the wiretaps, affidavit "A" established probable cause to believe that there was contraband or evidence at each of the four addresses for which search warrants were issued based on that affidavit. The defense contends that the trial court's editing of the affidavit did not go far enough. Specifically, the defense argues that, since the existence of defendant Henry Barra was learned from the wiretap on the phone at the Soap Box, all information in affidavit "A" involving sales by Mr. Barra also should have been excised by the trial court, citing Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), as support for its position.
In Wong Sun the Supreme Court ruled that an out-of-court declaration of a co-defendant in a narcotics prosecution must be excluded. The Court then considered whether its holding that the declaration be excluded *525 also required exclusion of the evidence to which police had been led by that declaration. The Court declined to hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the Court held that "the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Id. at 488, 83 S.Ct. at 417.
There are three situations in which the courts have found the evidence in question has been obtained by means sufficiently distinguishable to be purged of the primary taint: when the government learns of the evidence from an independent source (independent source doctrine); when routine investigatory procedures would have led eventually to discovery (inevitable discovery doctrine); and when the connection between the unlawful conduct and the discovery of the challenged evidence has become so attenuated as to dissipate the taint (attenuation doctrine). United States v. Crews, 445 U.S. 463, 470, 100 S.Ct. 1244, 1249, 63 L.Ed.2d 537 (1980). See also State v. Welch, 449 So.2d 468 (La.1984); State v. Guy, 575 So.2d 429 (La.App. 4th Cir.), writ denied, 578 So.2d 930 (La.1991).
The attenuation doctrine cannot apply in this case. However, the portions of affidavit "A" relating to drug sales by Henry Barra can be considered if there is an independent source which accounts for the police officers' contact with him, or if his identity as a member of the Cain organization would inevitably have been discovered.
Based on the record before us, the first two controlled purchases, which occurred before installation of any wiretaps, did not involve Henry Barra. Nor did a November 16, 1993 sale. An attempted undercover purchase on January 24, 1994 and purchases on February 13, 1994 involved Donald Johnson and Harrison Dixon. There is no indication that an informant provided Mr. Barra's name as a member of the Cain organization.
The first mention of Henry Barra occurs on page 8 of the search warrant affidavit "A", where it describes an intercepted call by Mr. Barra to the phone at 3341 N. Rampart Street on February 22, 1994.[17] During that call Mr. Barra was told to call the Soap Box Laundry. His call to that location, during which he spoke to Mr. Cain, was also intercepted, leading the police to increase surveillance at the laundry. Following this activity, affidavit "A" specifies that:
On March 1, 1994, Detective Brown contacted a confidential informant, hereafter referred to as the CI, [who] was known to be both reliable and credible. Information supplied by this CI, (sic) in the past has led to the arrests and convictions of numerous subjects and the confiscation of a considerable amount of narcotics. This CI was familiar with "Tomato", Henry Barra. Detective Brown requested that the CI attempt a controlled purchase from Barra. The CI agreed to participate in this task.
The CI referred to in this paragraph was not the same informant who was involved in the earlier controlled buys in 1993. The affidavit indicates that the officers sought out this informant and inquired of his knowledge of Henry Barra after Mr. Barra was intercepted by the wiretaps. The wiretap applications do not mention Henry Barra as a member of the Cain organization, although those applications contain information from informants identifying other people as members of the Cain organization.
We conclude that there is no independent source that would account for the police officers' contact with Mr. Barra, nor would his identity as a member of the Cain organization inevitably have been discovered. Consequently, all information pertaining to him must be excluded as an indirect product of the wiretaps and should have been excised from the affidavit. Wong Sun, 371 U.S. at 484, 83 S.Ct. at 416.
*526 After deleting from affidavit "A" all reference to evidence obtained either directly (recounting of taped conversations) or indirectly (information involving sales by Henry Barra) from the wiretaps, we consider the trial court's rulings as to each of the locations searched pursuant to warrants issued based on applications supported by that affidavit.
The court's denial of the motion to suppress evidence obtained at the Soap Box Laundry, 5400 St. Claude, was correct. Even after excising all the information obtained from the excluded wiretaps, the affidavit amply established probable cause for the search of this location. Three confidential informants, police surveillance confirming the informant's information, and the pen register evidence established that this business was a long-standing headquarters for drug trafficking.
The trial court's granting of the motion to suppress as to 3341 N. Rampart also was correct. Because the evidence indicates that all information regarding this address came from the wiretaps, the trial court's ruling granting that motion is affirmed.
The trial court suppressed the evidence seized from the residences at 5603 and 5710 Dauphine. The search warrants for these residences may be valid. Pen registers were placed on the phones at these addresses. The pen register information and the information known to the police at the time the wiretap warrants were issued may have been sufficient to establish probable cause for the search of those residences.
Because the police officers relied primarily on the wiretap evidence, the search warrant applications do not include the pen register information. The pen register evidence should be considered in determining if there is an independent source establishing probable cause. The trial court did not consider the bulk of the pen register evidence because it determined that it must be excluded. Additionally, the trial court did not consider any testimony from the investigating officers that may have included information that could establish an independent source to establish probable cause for the Dauphine Street warrants. Therefore, the court's ruling on the motions to suppress evidence found at 5603 and 5710 Dauphine Street is vacated, and we remand for reconsideration in light of our finding that there is no exclusionary rule for the pen register evidence and, if appropriate, for testimony regarding sources independent of the wiretaps.
Finally, we address the trial court's denial of the motion to suppress evidence seized at 1925 Benton Street. The application for this warrant shows that this location was implicated when the police intercepted several calls from Kenneth Cain at 3341 N. Rampart Street to a phone subscribed to an individual at this address, and close surveillance of this residence was begun. During this surveillance, on March 2, 1994, the officers observed foot traffic and activity at the residence which was consistent with drug trafficking. None of the applications in support of the pen registers or wiretaps indicate that the police received any information about the residents of 1925 Benton Street except from these wiretaps. For this reason, the defense motion to suppress as to this location should have been granted, and the ruling of the trial court denying that motion is reversed.

SUMMARY
The rulings of the trial court are affirmed in part and reversed in part. The trial court's decision to exclude the pen register evidence is reversed because there is no exclusionary rule applicable to this evidence. The court's granting of the defense motions to suppress all evidence obtained from the wiretaps is affirmed because the State failed to provide a reasonable explanation for the failure to immediately seal the wiretap tapes. As to the search warrants, the trial court's denial of the motion to suppress evidence seized from 5400 St. Claude, the Soap Box Laundry, is affirmed. The court's grant of the motion to suppress evidence seized from 3341 N. Rampart Street is affirmed. The denial of the motion as to evidence seized from 1925 Benton Street is reversed. Finally, the court's rulings as to evidence seized from the two Dauphine Street addresses is vacated and the case is remanded for further proceedings consistent with the views *527 expressed herein on the independent source doctrine.

WRIT GRANTED; AFFIRMED IN PART; REVERSED IN PART AND REMANDED.

APPENDIX A
The reasons and facts for the request of this search warrant are:

APPLICATION FOR SEARCH WARRANTS FOR

3341 NORTH RAMPART STREET

5710 DAUPHINE STREET

5603 DAUPHINE STREET

5400 SAINT CLAUDE AVENUE
In April of 1993, detectives assigned to the Narcotics Section of the New Orleans Police Department initiated an investigation of a narcotics trafficking organization which was based in the area of the Ninth Ward of New Orleans. A subject known as Kenneth Cain was identified as the leader of this organization. Detectives investigating this organization employed the use of three (3) confidential informants, all of whom were known to be reliable and credible.
The confidential informants all indicated that Cain and members of his organization were involved in the distribution of marijuana, cocaine, and heroin. The informants identified 5400 Saint Claude Avenue, the Soap Box Laundry, 5710 Dauphine Street and 5603 Dauphine Street as outlets for this organization. The informants additionally identified numerous members of the Cain organization as traffickers of the illegal substances.
On Thursday, April 22, 1993, detectives enlisted the aid of one of the confidential informants in a controlled purchase of marijuana. The marijuana purchased was delivered to the Soap Box Laundry Mat at 5400 Saint Claude Avenue.
On Thursday, June 17, 1993, detectives again enlisted the assistance of the same confidential informant in the controlled purchase of marijuana. Once again, this purchase occurred at the Soap Box Laundry Mat located at 5400 Saint Claude Avenue.
On Tuesday, November 16, 1993, detectives enlisted the aid of another confidential informant to conduct a controlled purchase of crack. The actual sale to the informant took place at 5603 Dauphine Street. However, negotiations and meetings regarding this transaction occurred at 5400 Saint Claude Avenue and 5710 Dauphine Street.

ATTEMPTED UNDERCOVER PURCHASE
On Monday, January 24, 1994, at approximately 7:40 PM, Detective Patrick Brown, acting in an undercover capacity, and in the company of a confidential informant, proceeded to the Soap Box Laundry Mat, 5400 Saint Claude Avenue, in an effort to purchase narcotics from members of the Cain organization. Detective Brown was equipped with a transmitter which allowed Sergeant Robert Bardy and Detective Pete Bowen to monitor all conversation generated by Detective Brown and any of the suspects in this investigation. Detective Brown's surveillance and cover team consisted of Sergeant Bruce Harrison, Detective Howard Gay and Detective Joseph Williams.
Prior to this occasion, Detective Brown had reviewed Bureau of Identification photographs of members of this organization listed in the application for this order and in this report. Detective Brown proceeded to the Soap Box Laundry Mat arriving there at approximately 7:40 PM. Detective Brown entered the location with the confidential informant. The confidential informant, hereafter referred to as the CI, approached a subject Detective Brown recognized as Donald Johnson. After a brief conversation, Johnson told a yet unidentified black male to make a telephone call. At this time, the following two (2) telephone calls were placed from the Soap Box Laundry Mat.
The caller then left the Soap Box Laundry Mat and proceeded on foot to 5105 Saint Claude under the surveillance of Detective Williams. The male remained in 5105 Saint Claude Avenue for several minutes and then returned to the Soap Box Laundry Mat. Upon his return, the male advised the CI he could not provide that weight of cocaine at this time. The CI and Detective Brown left *528 the location. Just after their departure, the following call was placed.

Controlled Purchase by a Confidential Informant
On Sunday, February 13, 1994, Detective Patrick Brown solicited the assistance of one of the confidential informants used in the application for the full wire intercept for a controlled purchase from members of the Cain organization. On this date, Detective Brown met with the confidential informant, hereafter referred to as the CI, and ensured the CI was free of contraband and currency. Detective Brown then supplied the CI with U.S. currency from the NOPD Narcotics Expense Fund.
Under the surveillance of Detectives Brown and Thomas, the CI proceeded to the Soap Box Laundry Mat at 5400 Saint Claude Avenue. Upon arrival, the CI met with a subject he recognized as Donald Johnson. Detective Brown later observed this subject and verified this subject was Donald Johnson. Apparently, Johnson was expecting Harrison Dixon to arrive within minutes because he did not place any telephone calls regarding the request of the narcotics by the CI. After several minutes, the black Ford Bronco II, with the temporary plate, arrived at the Soap Box Laundry Mat. The Bronco was occupied by one (1) subject. As this subject exited the driver's position, Detective Brown recognized him as Harrison Dixon. Johnson and the CI met Dixon in the parking area of the Soap Box Laundry Mat. The three (3) subjects conversed and Dixon re-passengered the Bronco and left the area. Johnson and the CI returned to the laundry. Due to the lack of manpower because of Mardi Gras coverage, the detectives were unable to follow Dixon.
Within several minutes, the Bronco, driven by Dixon, returned to the Soap Box Laundry Mat. As Dixon exited the Bronco, Johnson and the CI exited the business and met with Dixon in the parking area. Detective Brown observed an exchange between Dixon and Johnson and then Johnson and the CI. At this time, the CI handed the currency directly to Dixon. The CI then left the business under the surveillance of Detectives Brown and Thomas. The CI proceeded to a pre-arranged location where he turned over one-quarter (¼) ounce of crack cocaine to Detective Brown. The CI indicated the substance was delivered to Johnson by Dixon.
Detective Brown proceeded to Police Headquarters were he performed a field test on the substance purchased by the CI. This test resulted in a positive reaction for the presence of cocaine. Detective Brown turned over the crack to Officer Norfleet of the NOPD Central Property and Evidence Room under receipt number C045478.
This controlled purchase indicated that narcotics transactions are conducted at the Soap Box laundry located at 5400 Saint Claude Avenue.

Controlled Purchase of Heroin on Tuesday, March 1, 1994
On Tuesday, March 1, 1994, Detective Brown contacted a confidential informant, hereafter referred to as the CI, was known to be both reliable and credible. Information supplied by this CI, in the past has led to the arrests and convictions of numerous subjects and the confiscation of a considerable amount of narcotics. This CI was familiar with "Tomato", Henry Barra. Detective Brown requested that the CI attempt a controlled purchase from Barra. The CI agreed to participate in this task.
Detective Brown met with the CI and ensured he was free of all contraband and currency. Detective Brown then supplied the CI with currency from the NOPD Narcotics Expense Fund for the purchase of the heroin from Barra.
Detective Brown was then provided with a transmitter which allowed Sergeant Bardy and Detective Pete Bowen to monitor any conversations surrounding Detective Brown. The CI and Detective Brown then proceeded to the area of 513 South Rocheblave Street in search of Barra. Detective Brown was under the surveillance of Detectives John Brunet, Samuel Poole, and Howard Gay, along with Sergeant Harrison.
At approximately 4:40 PM, Detective Brown parked his undercover vehicle in the 500 block of South Rocheblave Street. The CI exited the vehicle and entered 513 South *529 Rocheblave Street. Once inside of the residence, the CI met with Barra and ordered a quantity of heroin. The CI then returned to Detective Brown's vehicle. This activity was observed by Sergeant Harrison.
At approximately 5:40 PM, Detectives Thomas and Williams observed Cain enter the Cadillac in the driver's position. Detectives Thomas and Williams followed Cain to 5710 Dauphine Street. Both Cain and Dixon entered 5710 Dauphine Street using keys which were in possession of Cain.
At approximately 5:42 PM, Detective Brown dropped Barra off at the Soap Box Laundry Mat. Detective Brown and the CI relocated to the intersection of North Rampart Street and Andry Street to wait for Barra. Detective Gay established surveillance of the Soap Box Laundry while Detectives Brunet and Poole established surveillance of Detective Brown and the CI. Detective Gay observed Barra enter the Soap Box Laundry and meet with a subject he recognized as Harrison Dixon.
At approximately 5:45 PM, Barra walked to Detective Brown's vehicle and advised Detective Brown and the CI that they would have to wait thirty (30) minutes for the heroin. Detective Brown, the CI and Barra then relocated a fast food restaurant in the area of 5400 Saint Claude Avenue under the surveillance of Detective Poole and Brunet.
At approximately 6:15 PM, Detective Brown dropped Barra off at the Soap Box Laundry and returned to the intersection of North Rampart Street and Andry Street with the CI. Detective Gay maintained surveillance of the Soap Box Laundry during this entire time. Detective Gay observed the male who had arrived with Cain, who was attired in a gray jacket and blue jeans, approach Barra in the parking area of the business. Barra and this subject exchanged objects. The male then returned to the business and Barra walked on Andry Street back to Detective Brown's vehicle at the intersection of North Rampart Street and Andry Street.
Once Barra returned to this vehicle, Barra handed the narcotics to the CI and the CI gave the narcotics to Detective Brown. Detective Brown then returned Barra to 513 South Rocheblave Street under the surveillance of Detectives Brunet, Poole and Gay. After returning Barra to this residence, Detective Brown proceeded to Police Headquarters where he performed a field test on the substance purchased. This test revealed a presence of heroin. Detective Brown then turned over the heroin to Officer Jones under receipt number CO46195.

Undercover Purchase By Detective Brown on Wednesday, March 2, 1994
On Wednesday, March 2, 1994, investigators elected to attempt an undercover purchase from Kenneth Cain through Henry Barra. Detective Brown was provided with a transmitter which allowed Sergeant Bardy and Detective Bowen to monitor any conversations around Detective Brown. Detective Brown's conversations were also recorded on audio tape.
Detective Brown was provided with $400.00 in U.S. currency from the Narcotics Expense Fund of the New Orleans Police Department. At approximately 7:50 PM, Detective Brown then proceeded to 513 South Rocheblave Street under the surveillance of Sergeant Harrison and Detective Gay. Detective Brown knocked on the door of the residence and was admitted by Henry Barra. Detective Brown advised Barra he wished to purchase one (1) bundle of heroin. Barra advised Detective Brown to relocate to the McDonald's Restaurant at the intersection of Tulane Avenue and Broad Street. Detective Brown complied.
At approximately 8:00 PM, Barra met Detective Brown at the McDonald's Restaurant. Barra entered Detective Brown's vehicle and under the surveillance of Detective Gay and Sergeant Harrison, Detective Brown and Barra proceeded the intersection of South Galvez Street and Tulane Avenue where Barra and Detective Brown used a pay telephone to call Cain's pager. This page was placed at approximately 8:02PM. At approximately 8:04PM, Cain attempted twice to call the pay telephone at this intersection. However, Barra and Detective Brown were using the telephone at this time to page Cain for a second time, therefore, the phone was busy.
*530 At approximately 8:10PM, Barra advised Detective Brown they should proceed to the Soap Box Laundry in an attempt to locate Dixon and Cain. Under the surveillance of Sergeant Harrison and Detective Gay, Detective Brown and Barra proceeded to 5400 Saint Claude Avenue, the Soap Box Laundry.
During this time, Detectives Thomas and Toye had established surveillance on the Soap Box Laundry and observed the Cadillac, Cain and Dixon at this location. At approximately 8:35PM, Detective Brown and Barra arrived at the Soap Box Laundry. Detective Brown provided the $400.00 to Barra and dropped him off on Andry Street approximately one-half block off of Saint Claude Avenue. Detective Brown proceeded to the intersection of North Rampart Street and Andry Street where Detective Thomas assumed surveillance of Detective Brown for his protection. Detective Toye and Sergeant Harrison established surveillance of the Soap Box Laundry. Sergeant Harrison and Detective Toye observed Barra walk into the parking area of the business where he met with Cain, Dixon and a subject Sergeant Harrison recognized as Donald Johnson. After a brief conversation, Cain, Dixon and Johnson entered a 1981 Chevrolet Monte Carlo, two (2) door, blue in color, bearing Louisiana license plate 412N948. This vehicle was registered to Maritza Perm of 6729 Madewood Drive in Metairie, Louisiana. At approximately 8:40PM, these subjects left the Soap Box Laundry.
Sergeant Harrison and Detective Gay followed this vehicle on Saint Claude Avenue across the Industrial Canal to Gallier Street. The vehicle turned in riverbound direction on Gallier Street to Burgundy Street where it turned in an uptown direction to Desire Street. The Monte Carlo turned in a lakebound direction on Desire and proceeded on Desire Street past North Rampart Street and parked along side of 3341 North Rampart Street arriving there at approximately 8:40PM. Cain, Dixon and Johnson exited the Monte Carlo and entered this residence through the side door with the use of keys which were in possession of Cain. Sergeant Harrison established stationary surveillance of 3341 North Rampart Street at this time.
At approximately 9:00PM, Cain, Dixon, and Johnson exited this residence. Johnson walked to North Rampart and turned in an uptown direction on North Rampart and walked out of the sight of Sergeant Harrison. Cain and Dixon entered the Monte Carlo and traveled on Desire Street to Saint Claude Avenue. Cain turned the vehicle in a downtown direction and Saint Claude Avenue. Sergeant Harrison and Detective Gay followed the Monte Carlo on Saint Claude Avenue back to the Soap Box Laundry. Cain and Dixon arrived there at this business at approximately 9:15PM.
Detectives Gay and Toye established surveillance of the parking area of this business. At approximately 9:16PM, Detectives Toye and Gay observed Barra meet Dixon and Cain. Barra handed Cain what appeared to be currency. Dixon then reached into the front of his pants and withdrew a small object which he handed to Barra. Barra examined the small object and then concealed the small object in the front of his pants. Barra then walked on Andry Street back to Detective Brown's vehicle. Cain and Dixon walked back into the business. At approximately 9:30PM, Barra arrived at Detective Brown's vehicle and entered the vehicle. Barra reached into the front of his pants and produced a small clear plastic packet which was later determined to contain twenty-five (25) aluminum foil packets each containing a white powdery substance later determined to be heroin. Prior to turning the narcotics over to Detective Brown, Barra stated he wanted one (1) of the packets to test the product. Barra removed one (1) of the aluminum foil packets from the plastic bag and then turned over the plastic bag containing twenty-four (24) aluminum foil packets to Detective Brown. Barra additionally stated that "Kenny" had obtained the narcotics directly for him.
Under the surveillance of all of the previously named narcotics officers, Detective Brown returned Barra to 513 South Rocheblave. Detective Brown then proceeded to the Police Headquarters where he performed a field test on the substance purchased. This *531 test revealed a presence of heroin. The narcotics were then turned over to Officer Shelmire under receipt number C046249.
The surveillance of this transaction indicated that narcotics are being concealed within the residence of 3341 North Rampart Street.
Based on all of the above information, Sergeant Harrison respectfully requests that search warrants be issued for the residences of 3341 North Rampart Street, 5710 Dauphine Street, 5603 Dauphine Street, and the business of the Soap Box Laundry located at 5400 Saint Claude Avenue.
NOTES
[1] La.Rev.Stat.Ann. § 15:1302(15) defines a pen register in pertinent part as "a device which records and decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted on the telephone line to which such device is attached...."
[2] The first wiretaps, issued on January 14, 1994, were placed on the phones at the Soap Box and at 5603 Dauphine Street. A renewal on the Soap Box wiretap and the wiretap for 3341 N. Rampart Street were issued on February 7, 1994. There was no phone at 5710 Dauphine Street.
[3] This requirement of the Louisiana statute regarding pen registers differs from its federal counterpart, which requires only that the applicant certify that the information likely to be obtained is relevant to an ongoing criminal investigation.
[4] In La.Atty.Gen.Op. No. 88-172, in which the Attorney General was called upon to state whether a court reporter could administer an oath to a witness over the phone. The Attorney General concluded that, to be valid, an oath must be given in the presence of a person authorized to administer it.
[5] In its brief, p. 11, the State invites this Court to find that Sergeant Harrison must have properly affirmed his oath before Judge Hansen. "Judge Hansen signs many warrants. He is aware of the oath requirement." Apparently this Court should presume that the statute was complied with despite the absence of any evidence that it was. This Court declines that opportunity, as errors can occur despite the experience and good faith of any judge. Furthermore, the renewal dated November 18, 1993 was signed by Judge pro tem Joseph DiRosa, and not by Judge Hansen.
[6] La.Rev.Stat.Ann. § 15:1307A states:

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the state, or a political subdivision thereof, if the disclosure of that information would be in violation of this Chapter.
[7] Interestingly, the United States Supreme Court reached its conclusion that a person had no privacy interest in phone numbers in 1979 because reasonable people were presumed to know that the telephone company used pen registers as a routine business practice for legitimate purposes. Today, in light of technology such as "Caller ID", there is even more justification to find that there is no legitimate expectation of privacy in numbers called.
[8] The defense has also asserted that the Magistrate Section of Criminal District Court for Orleans Parish is not a court of competent jurisdiction as required by La.Rev.Stat.Ann. § 15:1314A. There is no question that a magistrate judge is authorized to sign orders for pen registers. See La.Rev.Stat.Ann. § 13:1346D and § 15:1302(13).
[9] No previous pen registers had been placed on this phone. The phone at this location was in the name of defendant Harrison Dixon, who had previously been identified by a confidential informant as one of the members of Cain's organization.
[10] Ojeda Rios overruled the prior law of the Third Circuit as expressed in United States v. Falcone, 505 F.2d 478 (3rd Cir.1974), which held that suppression was not required for failure to comply with the sealing requirement of the Wiretap Act as long as the government could show that the physical integrity of the tapes had not been compromised.
[11] The State acknowledges that the last wiretap was terminated on March 6, 1994, and that none of the tapes was presented to the judge until June 24, 1994; the delays for presentation of the tapes to the judge ranged from 109 days to 136 days.
[12] We note that all of the cases relied upon by the State in support of its position predate Ojeda Rios.
[13] The record before this Court contains no evidence to indicate that the tapes were physically sealed prior to the June 1994 order. In any event, "sealing" for purposes of the identical federal requirement has been described as the process wherein the government attorney obtains "a sealing order simply by presenting the appropriate papers and tapes to the supervising judge. Other than gathering the tapes, putting them in boxes and taking the tapes to the supervising judge, the record discloses no other necessary steps to sealing." United States v. Carson, 969 F.2d 1480, 1489 (3rd Cir.1992). See also United States v. Quintero, 38 F.3d 1317, 1330 (3rd Cir. 1994), in which the court rejected the government's argument that it was sufficient that the tapes had actually been sealed by the law enforcement officers, even though not under judicial order. Quintero itself contains an exhaustive discussion of various cases involving delays.
[14] The recent rehearing decision by the Supreme Court in State v. Amanda Neisler et al., 94-1384 c/w 94-1540 (La. 1/16/96), 666 So.2d 1064 is not applicable to this case. Neisler dealt with the portion of the Electronic Surveillance Act that required presentment of an informant to the issuing magistrate rather than the sealing requirement at issue here. The Court found that the presentment requirement was significant only in cases in which the informant's credibility was critical to the issuance of the wiretap order. Id. at p. 1068. In contrast, the sealing requirement is designed to preserve the integrity of the evidence derived from a wiretap.
[15] In actuality, none of the information contained in the affidavits is directly linked to the pen registers.
[16] In State v. Barrilleaux, 620 So.2d 1317 (La. 1993), the Court somewhat relaxed the "four corners" requirement. However, it appears that this exception should be limited to cases where, for some good reason, additional information known by the affiant is not placed in the affidavit but is orally relayed to the magistrate prior to the signing of the warrant.
[17] No pen register was ever placed on the phone at 3341 N. Rampart Street. A single wiretap was placed on that phone on February 7, 1994, after wiretaps had been in place on the phones at 5603 Dauphine and the Soap Box.