798 So.2d 1057 (2001)
STATE of Louisiana
v.
Rene J. DECAY.
No. 01-KA-192.
Court of Appeal of Louisiana, Fifth Circuit.
September 13, 2001.
*1059 Bertha M. Hillman, Louisiana Appellate Project, Hillman Law Firm, Thiboudaux, LA, Attorney for Appellant/Defendant Rene J. Decay.
Paul D. Connick, Jr., Assistant District Attorney, Rebecca J. BeckerCounsel of Record on Appeal, Terry M. Boudreaux Appellate Counsel, Kia M. Habisreitinger Trial Counsel, John M. MaestriTrial Counsel, Assistant District Attorneys, Gretna, LA, Attorneys for Appellee State of Louisiana.
Panel composed of Judges JAMES L. CANNELLA, WALTER J. ROTHSCHILD and JAMES C. GULOTTA, Pro Tem.
*1060 CANNELLA, Judge.
The Defendant, Rene J. Decay, appeals from his conviction of possession of over 400 grams of cocaine, attempted possession of over 400 grams of cocaine, and carrying an illegal weapon by a convicted felon. He also appeals his enhanced life sentence. We affirm all convictions and two sentences, vacate the finding as a multiple offender and enhanced sentence and remand.[1]
On October 14, 1998 the Defendant was charged with violating La.R.S. 14:95.1, carrying an illegal weapon by a convicted felon, and two counts of violating La.R.S. 40:967A, possession of over 400 grams of cocaine, which occurred on June 6, 1998 and June 27, 1998. Additionally, he was also charged, along with twenty-one other defendants, with racketeering activity involving the sale and distribution of cocaine, a violation of La.R.S. 15:1353. All of the charges arose from wiretapping evidence. After pleading not guilty to all charges on August 24, 1999, he filed various pre-trial motions, including motions to suppress the confession, identification, and physical evidence obtained as a result of wiretapping.[2] The trial judge held ten hearings on defendants' motions to suppress the wiretap evidence,[3] and on April 20, 2000, denied them all with written reasons.
On August 4, 2000, the State noticed its intent to introduce the Defendant's statements at trial. On August 18, 2000, the Defendant filed supplemental motions to suppress the physical evidence and his confession. On September 5, 2000, he filed a second supplemental motion to suppress the wiretap evidence.[4] After the motions were again denied on September 28, 2000, the Defendant filed a motion to sever his trial, which was granted. The racketeering charges were then dismissed and the matter proceeded to a jury trial on September 28 and 29, 2000 on the charges of two counts of possession of over 400 grams of cocaine and carrying an illegal weapon by a convicted felon. Following trial, the jury found the Defendant guilty of one count of possession of over 400 grams of cocaine, one count of attempted possession of over 400 grams of cocaine and carrying an illegal weapon by a convicted felon.
On October 10, 2000, the State filed a bill of information alleging that the Defendant was a third felony habitual offender. On October 11, 2000, the Defendant filed a motion for new trial, which was denied. Immediately thereafter, on the possession conviction, the Defendant was sentenced to forty years imprisonment at hard labor and ordered to pay a fine of $250,000. *1061 See: R.S. 40:967F. For the attempted possession conviction, the Defendant was sentenced to twenty years imprisonment at hard labor and fined $125,000. See: La.R.S. 14:40:967A and R.S. 14:27. For the carrying an illegal weapon by a convicted felon conviction, he was sentenced to fifteen years imprisonment at hard labor. See: La.R.S. 14:95.1B. The sentences were ordered to be served consecutively and without benefit of parole, probation or suspension of sentence. His motion to reconsider the sentences was denied.
On October 13, 2000, the Defendant filed a motion to quash the habitual offender bill of information, which the trial judge denied. After a hearing, the trial judge found that the Defendant was a third felony habitual offender, vacated his original sentence of forty years imprisonment at hard labor and fine of $250,000.00, and sentenced him to life in prison, without benefit of parole, probation, or suspension of sentence. Defendant filed a timely motion for appeal.
As we stated in State v. Richardson, No. 00-KA-1551, this case arises from an investigation of drug trafficking in Jefferson Parish conducted in early 1998 by the Federal Bureau of Investigations (FBI), the Drug Enforcement Agency (DEA), the Louisiana State Police (LSP), and the Jefferson Parish Sheriff's Office (JPSO). According to Special Agent Wade Barnes of the DEA, law enforcement officers learned during their ongoing investigation that a man named "Terry England" (England), who was not charged in the bill of information for this case, and others, were trafficking cocaine in and around Jefferson Parish, Louisiana.
Through a wiretap on England's telephone, law enforcement officers learned that the Defendant was involved with England in cocaine trafficking in Jefferson Parish. After learning that the Defendant had three sources for cocaine beside the source that he and England used, the officers decided that the Defendant was a "viable target" for a wire intercept in an attempt to learn the identities of his three other sources.[5]
Based on information from the ongoing investigation, the agents obtained an authorization from a federal magistrate for initiating a pen register on the Defendant's home and cellular telephones.[6] The agents analyzed the telephone numbers reported by the pen registers and discovered a number of calls to known narcotics' distributors. Based on that information, Judge Clarence McManus, chief judge of the 24th Judicial District Court, signed three orders on May 28, 1998, authorizing wire intercepts, or wiretaps, to be initiated on the defendant's home, his cellular telephones and his digital pager.[7] The wiretap *1062 order mandated that the agents report the progress of their investigation every ten days during the intercept and authorized the wiretap for 30 days from the date of the order.
Pursuant to that order, JPSO agent, Eric Pearson, filed a report detailing the progress of the investigation based on telephone calls to the Defendant's home telephone number intercepted through June 8, 1998. According to the report, the agents learned from the wiretap that the Defendant planned to meet Esteen at 1:00 p.m. on June 6, 1998 at McDonald's next to Wal-Mart on Clearview Parkway in Jefferson Parish to buy two kilograms of cocaine for $18,500 each. That day, Trooper John Schmidt of the LSP, with other agents, including Agent Pearson, conducted a surveillance of the parking lot at 800 South Clearview Parkway and observed a blue 1989 Ford pickup truck enter that parking lot.
Trooper Schmidt believed that the blue 1989 Ford pickup truck belonged to the Defendant because he had previously seen the Defendant driving the vehicle, and because there was a large orange traffic cone in the bed of the pickup truck, which the Defendant always carried in his vehicle. Trooper Schmidt observed the Defendant drive into the McDonald's parking lot and stop near a green Ford Explorer. Esteen exited the green Ford Explorer and entered the Defendant's vehicle. The two drove toward Wal-Mart, made a U-turn and returned to Esteen's vehicle in the McDonald's parking lot. Esteen exited the Defendant's truck carrying a shoe box underneath his left arm, which he had not been carrying when he entered the Defendant's truck.
As Esteen entered his green Ford Explorer, a woman, later identified as co-defendant Sandra Sanchez (Sanchez), exited Esteen's Explorer carrying a large black bag. She then entered the Defendant's truck. The Defendant again drove toward Wal-Mart, following the same path which he had taken with Esteen. When they returned to Esteen's vehicle, Sanchez exited the Defendant's truck and entered Esteen's vehicle, still carrying the black bag. Both vehicles departed the parking lot, traveling in opposite directions.
The agents continued moving surveillance of both vehicles. When the Defendant drove across the Huey P. Long Bridge toward the Westbank of Jefferson Parish, Agent Pearson and other officers stopped the bridge traffic and "conducted a felony takedown" of the Defendant on the Westbank decline of the bridge. After the Defendant exited his truck, Trooper Nicholas Nelson and Agent Pearson observed two six inch by nine inch packages, later determined to contain approximately one kilogram of cocaine each, and a Ruger 9 millimeter handgun, in plain view on the floorboard of the Defendant's truck. Agent Pearson seized the packages and the handgun and arrested the Defendant. Tests later revealed that the packages contained 2000.7 grams of cocaine.
When Esteen's vehicle was stopped, the police found $33,920 in the shoe box that Esteen was carrying when he departed the Defendant's vehicle. Further, the police also found the large black bag that Sanchez was carrying when she entered and exited the Defendant's vehicle.
Later in the afternoon of June 6, 1998, the agents applied for a search warrant for the Defendant's residence, which was granted and executed that day. During the search, the agents seized digital scales, pots and pans, a safe containing $12,020 in cash, a scanner, and muffin tin, among other things. According to Agent Pearson, who, at that time, had worked in the Narcotics Division of the JPSO for more than three years, the muffin tin and pots *1063 and pans are significant because they are commonly used to cook cocaine into crack cocaine. The tin and pans contained a white residue.
According to Trooper Schmidt and Agent Pearson, the Defendant was present during the June 6, 1998 search of his residence and admitted to agents that he had just purchased two kilograms of cocaine from Esteen. At trial, Trooper Schmidt identified the Defendant as the man he overheard on the wire intercept, that he observed in the Wal-Mart parking lot, and who admitted to possession of over 400 grams of cocaine. Agent Pearson also identified the Defendant as the man whom he stopped on the Huey P. Long Bridge on June 6, 1998.
Sanchez testified at the Defendant's trial that, on June 6, 1998, she went with Esteen, who was her boyfriend at the time, to conduct a drug transaction with the Defendant. She said that Esteen put two kilograms of cocaine in the car and they drove to Wal-Mart in Harahan to meet the Defendant. Esteen exited the vehicle and received a shoe box of money. When Esteen re-entered the vehicle, he put the drugs in her purse. She then exited the vehicle, got into the Defendant's truck, and Defendant took the drugs from her purse.
Sanchez identified the two packages of cocaine as the packages which she gave the Defendant on June 6, 1998. She admitted that, in exchange for her testimony, she was allowed to plead guilty to one count of racketeering and two counts of possession with intent to distribute cocaine.
According to Trooper Schmidt, the Defendant posted a bond and was released from the Jefferson Parish Correctional Center on June 7, 1998. Further, the application for the sealing order filed by the Jefferson Parish District Attorney's Office states that law enforcement officers intercepted 24 audiotapes of communications on the Defendant's home telephone line between May 29, 1998 and June 8, 1998. On June 15, 1998, Judge McManus signed the order sealing the 24 audiotapes of the wire intercepts from the Defendant's home telephone line. According to Agent Pearson, the delay of approximately one week in presenting the box of tapes to Judge McManus for sealing occurred because Judge McManus was out of town.
Trooper Schmidt testified that, on June 27, 1998, the LSP received information that the Defendant was attempting another drug transaction with Esteen and his sister, Sonya Esteen McShane (McShane). Trooper Schmidt established surveillance of McShane's house in the Woodmere Subdivision and he observed the Defendant arrive at about 8:30 or 8:45 p.m. in a 1997 Oldsmobile Bravado, followed by a maroon vehicle that he had not previously observed.
McShane exited her house and greeted the Defendant. The two stood in front of the house until Esteen arrived in his Explorer. The three entered McShane's house for a short time then exited again. The Defendant immediately left the subdivision followed by the maroon vehicle. Trooper Schmidt radioed for backup from two LSP troopers in marked police units to stop both vehicles.
Trooper Shone Jackson attempted to stop the Defendant's vehicle but, after a high-speed chase westbound on Highway 90, the Defendant crashed his vehicle into a storage shed at a private residence and fled the scene. The LSP searched the area, but were unable to locate him.
Trooper Henry Thompson, however, succeeded in stopping the maroon vehicle near the intersection of Highway 90 and Jamie Boulevard. After Trooper Thompson stopped the vehicle and secured the *1064 driver in his police cruiser, Trooper Tim Bender assumed control of the investigation and advised the driver, Ashley Wallace (Wallace), of her rights. According to Trooper Bender, the driver signed a waiver of her constitutional rights and a form consenting to a search of her vehicle. A search resulted in the confiscation of two packages in a plastic bag from the backseat of her vehicle. Trooper Bender believed the packages contained two kilograms of cocaine. Later, tests revealed that the packages contained 2006.3 grams of cocaine.
On June 28, 1998, Trooper Schmidt prepared two arrest warrants for the Defendant for possession of cocaine and resisting arrest by flight. On September 15, 1998, he was located in Los Angeles, California, arrested pursuant to the outstanding arrest warrants in Jefferson Parish, and returned to Jefferson Parish. At trial, Trooper Schmidt identified the Defendant as the person that he saw at McShane's house on June 27, 1998.
Wallace testified at trial that she knew the Defendant from her neighborhood and, when she was talking to him on the phone on June 27, 1998, he told her to meet him at McDonald's to "make a run." She knew that "make a run" meant going to pick up cocaine. She testified that she followed the Defendant that night in her maroon Pontiac Grand Prix to a house in the Woodmere Subdivision and that two men in a green truck pulled up behind them. She further testified that the two men went to the Defendant's truck where he gave the other man a brown Dillard's shopping bag that contained $35,000. Wallace stated that the two men went into the house and, when they returned, the other man, at the Defendant's instruction, put the Dillard's bag, which now contained cocaine, into the backseat of her car.
Wallace reluctantly identified the Defendant at trial. She admitted that she testified pursuant to a plea bargain agreement with the State, which reduced the charges against her. Wallace stated that she was 15 years old when she was arrested on June 27, 1998 for possession of two kilograms of cocaine. She served eight months in juvenile detention in 1998 and 1999 on those charges.
At the March 26, 1999 hearing on the Defendants' motion to suppress, the State introduced the sealed box containing the 24 wiretaps from the Defendant's home telephone without objection from any of the defense counsel at that hearing and the trial judge admitted the sealed box.[8] In her written denial of the Defendants' motions to suppress, Judge JoEllen Grant stated:
Similarly, the recordings made via the intercept on the Decay home telephone and pager are not subject to suppression. At the conclusion of the intercept, the tapes were made available to Judge McManus and sealed pursuant to his directions. Judge McManus executed the sealing order and initialed the seals.
Because the Defendant was in federal custody and unable to attend many of the ten previous hearings on the motions to suppress, on September 21, 2000 and September 25, 2000, Judge Grant, with the State's agreement, allowed the Defendant *1065 to reurge his motion to suppress and heard argument on all three of his supplemental motions to suppress evidence and confession.[9] He was also allowed the opportunity to cross-examine several police officers on issues raised during the suppression hearings from which he was absent, including the sufficiency of the affidavit in support of the wiretap as well as the search warrant for his house. On September 28, 2000, Judge Grant denied the Defendant's supplemental motions to suppress, stating:
On Rene Decay, I have had an opportunity to review some of the things that I reviewed previously for the other motions, the application for the wiretap, some other things, also, and, at this point in time. I am still going to deny the Motion to Suppress. I feel that there was sufficient information in the application for the wiretap on both the phone and the cell phone toI mean, they listened to conversation after conversation after conversation which involved him with drugs. They indicated why they could not corroborate. And my original opinion said that I understood all of those and agree with all of those, so I am going to deny the Motion to Suppress the Wiretap. On the search warrant, that's the other thing? Okay. The search warrant ... does somebody have one, the search warrant, `cause I need to take a real quick look at itfor his house ... I refreshed myself on the search warrant. Based on the search warrant, I think there was sufficient grounds to go into the house. He left there, had some things, had the cocaine; reason to believe there was money or cocaine, which is what they were looking for ...
On appeal, the Defendant first asserts that the trial judge erred in denying his motion to suppress the evidence obtained from the wiretaps because they had not been sealed immediately as required by La.R.S. 15:1310(F)(1), because they had not been sealed in the presence of the judge as required by La.R.S. 15:1310(F)(2), and because the State failed to prove that other investigative measures had been tried and failed as required by La.R.S. 15:1310(A)(3). Second, he contends that the trial judge erred in conducting hearings in which the Defendant and the attorney for the Defendant were not present. Third, he claims that the trial judge committed prejudicial error at the trial in allowing Trooper Schmidt, over defense counsel's objection, to testify as to his opinion on matters that required expertise, even though he had not been qualified as an expert. Fourth, he asserts that the sentence of life imprisonment is constitutionally excessive.

THE WIRETAPS
This assignment of error is identical to the first assignment in the companion case, State v. Richardson, 00-KA-1551. Thus, our discussion at times quotes and/or tracks the opinion in Richardson.

A. Timing of the seal of the wiretap evidence under La.R.S. 15:1310F(1)
In this subpart of assignment of error number one, the Defendant contends that the trial judge erred in denying his motion to suppress the wiretap evidence because the wiretaps were not timely sealed as required by La.R.S. 15:1310F(1). The State contends that the Defendant has not preserved this issue for review, since he did not raise this issue in his motion to *1066 suppress or at any of the hearings on his motion to suppress.
Louisiana's Electronic Surveillance Act, La.R.S. 15:1310 provides the procedure which law enforcement officials must follow for lawful interception of wire or oral communications. La.R.S. 15:1310F(1) provides that:
The contents of any wire or oral communication intercepted by any means authorized by this Chapter shall be recorded on tape or wire or other comparable device. The recording of the contents of any wire or oral communication under this Subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recording shall be wherever the judge orders. They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years. Duplicate recordings may be made for use or disclosure pursuant to the provisions of R.S. 15:1309(A) and (B) for investigations. The presence of the seal provided for by this Subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or evidence derived therefrom under R.S. 15:1309(C).
At the hearings on the motions to suppress, the Defendants argued that the police did not fully comply with the requirement that audiotape evidence must be sealed.[10] No one argued, during the portion of the suppression hearings devoted to the Defendant's wiretaps, that the audiotape evidence collected from the wiretap on his home telephone was not timely sealed by the trial judge. In arguing his motion to suppress, the Defendant stated, "I am adopting the various questions that were put forth at all the previous motion hearings, Judge, and would like the Court to incorporate all of the previous motion hearings in support of my Motions to Suppress in this case." Further, in his separate suppression hearings, the Defendant did not raise the issue of the timeliness of the seal on the wiretap evidence. His argument was that the evidence was subject to suppression since it was seized without a valid warrant or a valid exception to the warrant requirement.
Moreover, at the March 26, 1999 suppression hearing, both Agent Barnes and Agent Pearson testified that the wiretap, which was authorized on May 28, 1998, was stopped on June 8, 1998, and the audiotape evidence of the wiretaps was sealed on June 15, 1998. The wiretap order authorized wire interception of telephone calls on the Defendant's home telephone line until June 28, 1998.
At the initial suppression hearings, the co-defendants did not question the policemen about the delay between the date the wiretap was stopped or the date the tapes were sealed. Furthermore, when the State introduced the sealed box containing the Defendant's wiretap evidence, none of the co-defendants objected to its introduction. In his separate suppression hearings, the Defendant failed to cross-examine Agent Pearson, who was available at that *1067 hearing, on the timeliness of the seal on the wiretap evidence. Further, he also failed to specifically object to the introduction of the wiretap evidence on the grounds that it was not timely sealed. This issue is presented for the first time in this Court.
In State v. Smith, 94-120 (La.App. 5th Cir.5/31/94), 638 So.2d 452, we declined to address the defendant's argument regarding suppression of evidence, where he had failed to argue the issue in the trial court, noting:
The defense has the burden of asserting the basis for its motion to suppress. LSA-C.Cr.P. art. 703 E. The state is entitled to adequate notice so that it will have an opportunity to present evidence and address the issue. Defendant is limited on appeal to the grounds articulated at trial. A new basis, even if meritorious, cannot be raised for the first time on appeal. State v. Johnson, 389 So.2d 372 (La.1980); State v. Stokes, 511 So.2d 1317 (La.App. 2nd Cir.1987), writ denied, 516 So.2d 129 (1987).
Smith, 638 So.2d at 455-456.[11]
Nonetheless, as in the aforementioned companion case of State v. Richardson, we will address the issue, quoting our discussion in Richardson since the issue is identical, as follows:
Both Defendant (and the State) rely on United State v. Ojeda Rios, et al., 495 U.S. 257, 110 S.Ct. 1845, 109 L.Ed.2d 224. However we find Ojeda Rios distinguishable.[12] That case holds that the federal statute which regulates the interception of wire communications[13] requires the seal to be obtained immediately upon expiration of the underlying surveillance order to limit the government's opportunity to alter the recordings. 495 U.S. at 263, 110 S.Ct. at 1849. Further, if there is a delay in sealing the recordings, the language of the statute requires that the government explain not only why a delay has occurred, but also why it is excusable. 495 U.S. at 265, 110 S.Ct. at 1850.
In Ojeda Rios, there had been several orders. The district judge found that (1) there had been at least an 82-day delay in sealing the tapes obtained from the first suspect's old residence under the first order, since the second order was not an extension of the first, and (2) the sealing of the tapes concerning the other two suspects had been delayed 118 days after the February 17, 1985 expiration of the fifth order (regarding the public telephones near their residence), since the sixth order was not an extension of the fifth. The judge suppressed the first and fifth tapes on the basis of the delays. The United States Supreme Court did not overrule the finding, but remanded for a determination from the Second Circuit as to whether the government advanced, in the district court, a `satisfactory explanation' for the delay in sealing the recordings after the wiretap order had expired. 495 U.S. at 267, 110 S.Ct. at 1851.

*1068 Although Ojeda Rios stands as the United States Supreme Court's pronouncement on the issue of what constitutes immediate sealing of recordings after a wiretap order has expired, it does not apply in this case because the audiotape evidence was sealed before the wiretap order had expired.
In La.R.S. 15:1310F(1) of the Louisiana Electronic Surveillance Act, like the federal wiretap statute, specifies that, "Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." (Emphasis added). In this case, law enforcement officers could have continued to record communications that occurred on the home telephone line (as well as the cellular telephone line and Decay's pager) until June 28, 1998, when the wiretap order expired. Although the wiretap was discontinued on June 8, 1998, the evidence was sealed on June 15, 1998, about two weeks before the wiretap order expired on June 28, 1998. Therefore, we find that the recordings were timely sealed under the specific language of La.R.S. 15:1310F(1).

B. Sealing in the presence of a judge as required by La.R.S. 15:1310F(2)
The Defendant next contends that the tapes were not sealed in the presence of a judge as required by the statute. The State responds that the statute requires only that the tapes be made available to a judge and sealed under his directions.
La.R.S. 15:1310F(2) provides:
Applications made and orders granted under this Chapter shall be sealed by the judge. Custody of the applications and orders shall be wherever the judge directs. Such applications and orders shall be disclosed only upon a showing of good cause before a judge in whose district the interception of wire or oral communication took place and shall not be destroyed, except on order of the issuing or denying judge, and in any event shall be kept for ten years.
In Richardson, we continued:
At the suppression hearing on March 26, 1999, Judge Clarence McManus testified as to his general procedure when sealing evidence obtained from wiretaps. He did not testify specifically about Exhibit S-1M, the box at issue in this appeal. He did, however, testify that he did not usually see the tapes or inspect the tapes individually when he signed the sealing order. He indicated that the officer who brings the box to be sealed has generally already sealed the box before presenting the box and sealing order for his signature.
Agent Eric Pearson of the Jefferson Parish Sheriff's Office testified that he gathered the recordings of the wiretap on Decay's home telephone line at the Sheriff's Office and brought the box to Judge McManus' office for sealing. He testified that, usually sheriff's office personnel do not seal the box containing recordings before presenting the box for sealing, but he could not remember whether he had sealed this specific box before presenting it to Judge McManus. He also indicated this case was his first as a case agent.
Trooper John Fitzpatrick of the Louisiana State Police testified that he was present when the box of tapes from the Decay wire intercept was brought to Judge McManus for sealing. He testified that the judge signed the seal on the box as well as the sealing application and order. He was not asked whether the box of tapes was sealed before the judge signed the sealing order.

*1069 In her written reasons for denying the suppression motion, the trial judge stated, "At the conclusion of the intercept, the tapes were made available to Judge McManus and sealed pursuant to his directions. Judge McManus executed the sealing order and initialed the seals.".
In State v. Cain, 95-0054 (La.App. 4th Cir.2/27/96), 670 So.2d 515, a published writ disposition,[14] the Fourth Circuit Court of Appeal noted that "sealing" has not been defined by the Electronic Surveillance Statute, but stated that:
In any event, `sealing' for purposes of the identical federal requirement has been described as the process wherein the government attorney obtains `a sealing order simply by presenting the appropriate papers and tapes to the supervising judge. Other than gathering the tapes, putting them in boxes and taking the tapes to the supervising judge, the record discloses no other necessary steps to sealing.' United States v. Carson, 969 F.2d 1480, 1489 (3rd Cir.1992). See also United States v. Quintero, 38 F.3d 1317, 1330 (3rd Cir.1994) ...

Id. at 523, n. 13.
Here, the officers testified that they presented the tapes to Judge McManus at his office, along with the sealing application and order. They also testified that he signed the application and order, as well as the seal on the box. While it was not clear from the record whether the box was sealed before it was brought to Judge McManus' chambers, we find that the statute does not require the judge ordering the seal to view each tape before the box is sealed, nor does it require that the box be unsealed before presentment to the judge. Id.

Based on the foregoing, we find that the trial judge correctly ruled that the tapes were not subject to suppression on the basis that the State failed to comply with the statute's sealing requirements.
In this case, we find also that the trial judge did not err in denying the Defendant's motion to suppress on the basis that the State failed to comply with the statute's sealing requirements.

C. Other investigative measures required by La.R.S. 15:1310A(3) and C(4)
Next, the Defendant, along with co-defendant Richardson, contends that the State failed to establish that "other investigative procedures", including undercover agents, confidential informants, or surveillance, had been tried and had failed prior to seeking authority for the wiretap.
La.R.S. 15:1310A and A(3) states that:
A. Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge in whose district such interception of wire or oral communication shall take place and shall state the applicant's authority to make such application. Each application shall include the following information:....
(3) A full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous, or that such circumstances exist that without immediate action a human life may be endangered.
In addition, La.R.S. 15:1310C and C(4) provides:
C. Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or *1070 approving interception of wire or oral communications within the territorial jurisdiction of the district in which the judge is sitting, if the judge determines on the basis of the facts submitted by the applicant that:
(4) There is reason to believe that investigative procedures have been tried and failed or they reasonably appear to be unlikely to succeed if tried or to be dangerous, or that such circumstances exist that without immediate action a human life may be endangered.
We reiterate the evidence as we stated in Richardson:[15]
In this case, the State introduced a copy of the affidavit in support of the application for the wire intercept authorization, which listed other investigative procedures available, but not practical in this case. The affiants included Louisiana State Trooper John Fitzpatrick, Jefferson Parish Sheriff's Office Narcotics Agent Eric Pearson, and DEA Special Agent Wade Barnes.[16] The information in the affidavit tracks Agent Barnes testimony at the suppression hearing on March 26, 1999.
Agent Barnes testified that pen registers would not have been as effective in this case because the registers only provide the name of the party being called, not the purpose for the call. He also testified that, while physical surveillance is useful, it does not provide details of the conversations or meetings of the target subject, and that Decay was highly suspicious so he employed "counter surveillance" techniques, which made him difficult to follow. (See: R., pp. 213-214). Agent Eric Pearson further noted in his testimony at a later hearing on the Defendants' motion to suppress, that the agents did use physical surveillance in their investigation of the entire drug ring, but it only became useful only after they obtained information from the wire intercept on Decay's home telephone line. (R., pp. 425-427).
Agent Barnes testified that grand jury subpoenas would not have been useful in this investigation either, because the subjects would very likely invoke their Fifth Amendment privilege against self-incrimination, which would stall the investigation. He further explained that although confidential informants can provide very valuable information about the identity of co-conspirators and methods of drug trafficking, most confidential informants are not privy to every aspect of an organization, including where drugs are hidden, how drugs are imported into the area or how the drugs are distributed. The Agent stated that search warrants can be very useful, but searching a subject's home will usually not reveal information regarding co-conspirators and other aspects of the investigation.
Agent Barnes further testified that undercover agents were not used in this investigation because they are not always able to infiltrate an organization to the extent necessary to understand every aspect of the organization. Although interviews of subjects are useful, they are limited in their scope since one subject is usually knowledgeable about certain aspects of an organization, but may not have any information on other aspects of the organization.
The trial court decision to deny a motion to suppress is afforded great *1071 weight and it will not be set aside unless the evidence clearly favors suppression. State v. Williams, 98 1006 (La.App. 5th Cir.3/30/99), 735 So.2d 62, 73, writ denied, 99-1077 (La.9/24/99), 747 So.2d 1118. She found, and we agree, that the alternative methods were not practical and unlikely to succeed. Thus, we find that the trial judge did not err in denying the Defendant's motion to suppress the physical evidence that was seized based on the wiretapping of his telephones.

DUE PROCESS
The Defendant argues in his second assignment of error that he was denied his right to effective assistance of counsel and due process because the trial court allowed hearings on the motion to suppress to proceed, which neither he nor his attorney attended.
The State responds that, although he was not present for the suppression hearings until September 10, 1999, the Defendant was not prejudiced by this absence because he was later allowed to file three supplemental motions to suppress, which were heard separately. The State also notes that at those later hearings he was allowed to cross examine the witnesses whom he was unable to cross examine due to his absence from the previous hearings.
The Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution guarantees an accused the assistance of counsel in all criminal prosecutions. The United States Supreme Court has instructed that "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation." United States v. Morrison, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981). The Court explained that:
Our approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the Defendant the effective assistance of counsel and a fair trial. The premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding....
Id. at 449 U.S. at 365, 101 S.Ct. at 668.
In the present case, the Defendant was absent from the suppression hearings held prior to September 10, 1999.[17] However, he was represented at the co-defendant's hearings at the final four hearings on his co-defendants' motions to suppress. Furthermore, the Defendant was allowed to file three supplemental motions to suppress in which he sought suppression of evidence seized from his vehicle and house on June 6, 1998, of evidence seized from another vehicle driven by the Defendant on June 27, 1998, of his statement given in connection with pending federal charges, and, finally, of wiretap evidence. The contradictory hearings on those motions were heard on September 21 and September 25, 2000. During the hearings, he was allowed to present testimony and cross-examine the State's witnesses on the pertinent issues. Thus, the Defendant was afforded ample opportunity to challenge the admissibility of the physical evidence seized, his confession, and the wiretap evidence. *1072 Furthermore, he has failed to show any prejudice as a result of his attorney's absence at the hearings. Thus, we find neither a constitutional infringement nor prejudice to the Defendant under these facts.

OPINION TESTIMONY
The Defendant next contends that the trial judge erred in allowing Trooper Schmidt, over defense counsel's objection, to testify as to his opinion on matters that required expertise even though he had not been qualified as an expert. The Defendant specifically refers to Trooper Schmidt's testimony regarding two telephone conversations between the Defendant and Esteen that the Trooper heard which disclosed the Defendant's desire to buy two kilograms of cocaine from Esteen. The State responds that the trial judge did not err in allowing the testimony since the Louisiana Code of Evidence allows a lay witness to express opinion testimony under certain circumstances, including when those opinions are rationally based on the perception of the witness.
Trooper Schmidt was the lead officer in this investigation. The testimony at issue was obtained after the recording of the June 5, 1998 telephone call was played for the jury, as follows:
PROSECUTOR:
Trooper Schmidt, are you familiar with that call that came in on June 5th, 1998?
TROOPER SCHMIDT:
Yes, ma'am, I am.
PROSECUTOR:
I'm going to turn your attention to the latter part of the conversation where someone says, "`cause I be trying to get me about two, bra." Based on your experience, do you have an indication of what that could have meant?
TROOPER SCHMIDT:
Yes, ma'am. I believe that that [sic] to be a quantity of cocaine that Mr. Decay is trying to acquire from Mr. John Esteen.
PROSECUTOR:
And what, based on your experience and your knowledge of wiretap investigation in this case, what kind of quantity are you talking about?
TROOPER SCHMIDT:
We know it's a specific quantity due to the nature of the individuals that were involved in this case. We believe that to be two kilograms of cocaine.
PROSECUTOR:
The State would move to play call number 602.
THE COURT:
All right, Mr. Creech, are you ready with that one?
DEFENSE ATTORNEY [Mr. Creech]:
I am, Judge.
THE COURT:
Go ahead.
(Call number 602 played)
PROSECUTOR:
Trooper Schmidt
TROOPER SCHMIDT:
Yes, ma'am?
PROSECUTOR:
do you recognize the voices of Rene Decay and John Esteen?
TROOPER SCHMIDT:
Yes, ma'am, I do.
PROSECUTOR:
What was this conversation about?
TROOPER SCHMIDT:
This was a conversation on the following morning, Saturday morning, June 6th, where Mr. Decay is reiterating that he needs to get a quantity of cocaine from John Esteen and that arrange
DEFENSE ATTORNEY:
Your Honor, I'm going to object to his interpretation. It's up to the jury to *1073 decide that, what this conversation is about.
THE COURT:
State?
PROSECUTOR:
The State would submit to this Court that based on his experience and his previous testimony that narcotic traffickers do not come out specifically and say the exact quantity, the exact type of drug that they're trying to utilizeor to obtain, but rather to talk in code, to talk in secret. And also the State would say that it is not really being offered for the proof of the matter asserted, rather it is offered to show what his intention was, what his mind set was when he set up the surveillance and he pursued these Defendants. And the jurors can, of course, make their own interpretation.
THE COURT:
Well, he hasn't been offered as an expert at this time and he can't give expert testimony. He can give a lay opinion. The Code permits lay opinions, and that's the best it will be at this time; not an expert opinion, only a lay opinion. And I overrule his giving an opinion in that area, Mr. Creech.
Go ahead. Proceed.
PROSECUTOR:
Trooper Schmidt, I'm going to turn your attention to the early part of the conversation where John Esteen asked, "What are you looking for," and the response was two.
TROOPER SCHMIDT:
Yes, ma'am.
PROSECUTOR:
Based on your experience, what did you interpret that to mean?
TROOPER SCHMIDT:
A quantity of cocaine.
PROSECUTOR:
Also a little bit later when John Esteen said, "But if you want it later on, I can go 18/5 later." Based on your experience, what did you interpret that to mean?
DEFENSE ATTORNEY:
Your Honor, again, I need to interject an objection here. She said, "Based on your experience." This is just a lay opinion.
PROSECUTOR:
Judge, this is a man who has just testified
THE COURT:
But he hasn't been offered as an expert, so he can't give an expert opinion, right?
PROSECUTOR:
Judge, he doesn't have to be offered as an expert. He has stated his experience in this area, his experience in wire intercept law. I am asking him to call on that experience. I'm not saying that he is an expert on all of this investigation.
THE COURT:
Well, he's giving testimony. When you say, "What is your opinion," then he must be an expert to give an opinion in an expert area.
PROSECUTOR:
Judge, I'm asking him what was his mind set, what did he believe certain things to mean.
THE COURT:
That will only be taken by the jury as a lay opinion at best and not an expert opinion. So, he can testify in that area. The State has not seen to qualify him as an expert based on his training and experience. So, with that, over the objection of the defense, as a lay opinion only.
(R., pp. 822-825).
At no time did the Defendant object when the State asked Trooper *1074 Schmidt about his perception of the content of the June 5, 1998 conversation, in which the Defendant allegedly asked to purchase two kilograms of cocaine from Esteen. Failure to make a contemporaneous objection precludes appellate review. La.C.Cr.P. art. 841. Therefore, the Defendant's argument that the trial court erred in allowing Trooper Schmidt to testify about his perception of the June 5, 1998 telephone call is not properly before this Court. Nonetheless, this type of testimony is permitted under La.C.E. art. 701, which states:
If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
(1) Rationally based on the perception of the witness; and
(2) Helpful to a clear understanding of his testimony or the determination of a fact in issue.
Generally, a lay witness can only testify to the facts within his knowledge and not to impressions or opinions; however, a witness is permitted to draw reasonable inferences from his personal observations. State v. Hubbard, 97-916 (La.App. 5th Cir.1/27/98), 708 So.2d 1099, 1106, writ denied, 98-0643, (La.8/28/98) 723 So.2d 415, (citing State v. Alexander, 430 So.2d 621 (La.1983)). Where the subject of the testimony is such that any person of experience may make a natural inference from observed facts, a lay witness may testify as to such inferences, provided he also states the observed facts. Id. (citing State v. Carter, 96-358 (La.App. 5th Cir.11/26/96), 685 So.2d 346).
In addition, unless otherwise provided by law, all relevant evidence is admissible at trial. La.C.E. art. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La.C.E. art. 401. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, considerations of undue delay, or waste of time. La.C.E. art. 403. The determination concerning relevancy of evidence is within the discretion of the trial judge whose rulings will not be disturbed in the absence of an abuse of discretion. State v. Winfrey, 97-427 (La.App. 5th Cir.10/28/97), 703 So.2d 63, 75, writ denied, 98-0264, (La.6/19/98), 719 So.2d 481, (citing State v. Carter, 96-358, (La.App. 5th Cir.11/26/96), 685 So.2d 346, 351).
In this case, the State did not offer Trooper Schmidt as an expert witness. Here, Trooper Schmidt was testifying to inferences he made based on his observations and experience. Further, his testimony was based on his seven years of experience as a Louisiana State trooper, including two years as a member of the FBI narcotics task force in New Orleans. His testimony was also relevant to show the steps in the investigation in which he and other law enforcement officers conducted surveillance of the Defendant and Esteen on June 6, 1998. Therefore, we find that the trial court properly allowed Trooper Schmidt to testify to inferences regarding the content of the recorded conversations based on his own observations.
Furthermore, even if this testimony was erroneously admitted, its introduction was harmless and its probative value was not substantially outweighed by the danger of unfair, prejudice, confusion of issues, misleading the jury, undue delay or waste of time. In this case, the evidence presented at trial overwhelmingly supports the jury's guilty verdicts.

*1075 EXCESSIVE SENTENCE
In his fourth assignment of error, the Defendant contends that the trial judge erred in denying his motion to reconsider a constitutionally excessive sentence because he did not adequately consider the guidelines set forth in La.C.Cr.P. art. 894.1 in particularizing his life sentence. He argues that the maximum sentence was unwarranted in his case because he is not the worst type of offender and his was not the most serious offense.
The State responds that, although the Defendant filed a motion to reconsider his underlying sentence, he did not file a motion to reconsider his enhanced sentence. The State also points out that, after finding that the Defendant was a third felony habitual offender, the trial judge imposed the minimum mandatory sentence, not the maximum sentence. The State notes that the Defendant did not present evidence at the habitual offender sentencing hearing to rebut the presumption of constitutionality of the minimum prison sentence mandated by La.R.S. 15:529.1.
The record reflects that the Defendant failed to file a motion to reconsider his enhanced sentence, but he did verbally object when it was imposed.
La.C.Cr.P. art. 881.1 provides that a defendant may file a motion to reconsider sentence within 30 days of sentencing, but requires that the motion be made orally at the time of sentencing, or in writing, and that it set forth the specific grounds on which the motion is based. The failure to file a motion to reconsider sentence, or to state the specific grounds on which the motion is based, precludes a defendant from raising those grounds on appeal. State v. Mims, 619 So.2d 1059 (La.1993); State v. Holmes, 94-907 (La. App. 5th Cir.3/15/95), 653 So.2d 642, 646. In Mims, the Louisiana Supreme Court was silent as to whether the failure to comply with Article 881.1 precludes even a claim of constitutional excessiveness. However, in similar circumstances, this Court has considered the issue of whether the sentence was constitutionally excessive. State v. Tribbit, 00-153 (La.App. 5th Cir.8/29/00); 767 So.2d 901, 903; State v. Stec, 99-633 (La.App. 5th Cir.11/30/99), 749 So.2d 784, 789; State v. Richmond, 98-1015 (La.App. 5th Cir.3/10/99), 734 So.2d 33, 38.
Both the United States and Louisiana constitutions prohibit the imposition of excessive or cruel punishment. U.S. Const.Amend. 8 La. Const. of 1974, Art. I, Sect. 20. Richmond, 734 So.2d at 38. A sentence is generally considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. Id.; State v. Lobato, 603 So.2d 739, 751 (La. 1992).[18] A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. However, the sentence will not be set aside absent a showing of manifest abuse of the trial court's wide discretion to sentence within statutory limits. Richmond, 734 So.2d at 38. The trial judge is afforded wide discretion in determining a sentence and, if the record supports the sentence imposed, the court of appeal will not set aside a sentence for excessiveness. La.C.Cr.P. art. 881.4(D); Richmond, 734 So.2d at 38. Furthermore, a sentence may be reviewed for excessiveness even though it is within statutory range. Id.
*1076 La.R.S. 15:529.1(A)(1)(b)(ii) provides that:
If the third felony or either of the two prior felonies is a felony defined as a crime of violence under R.S. 14:2(13) or as a violation of the Uniform Controlled Dangerous Substances Law punishable by imprisonment for more than five years or any other crime punishable by imprisonment for more than twelve years, the person shall be imprisoned for the remainder of his natural life, without benefit of parole, probation, or suspension of sentence.
Here, the trial judge found that the Defendant was a habitual felony offender with an underlying felony drug offense and sentenced him as a third felony offender under La.R.S. 15:529.1(A)(1)(b)(ii).[19] Further, the Louisiana Supreme Court has repeatedly upheld the constitutionality of Louisiana's Habitual Offender Law. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672; State v. Dorthey, 623 So.2d 1276 (La.1993). Nonetheless, the courts have the power to declare a sentence excessive under Article I, § 20 of the Louisiana Constitution even though it falls within the statutory limits provided by the Legislature. State v. Lindsey, 99-3256 (La.10/17/00), 770 So.2d 339, 342; Johnson, 709 So.2d at 676.
In Johnson, the Court established guidelines on downward departures from the minimum sentence mandated by the Habitual Offender Law:
A sentencing judge must always start with the presumption that a mandatory minimum sentence under the Habitual Offender Law is constitutional. A court may only depart from the minimum sentence if it finds that there is clear and convincing evidence in the particular case before it which would rebut this presumption of constitutionality.
. . . .
Under the Habitual Offender Law those third and fourth offenders who have a history of violent crime get longer sentences, while those who do not are allowed lesser sentences. So while a Defendant's record of non-violent offenses may play a role in a sentencing judge's determination that a minimum sentence is too long, it cannot be the only reason, or even the major reason, for declaring such a sentence excessive.
Instead, to rebut the presumption that the mandatory minimum sentence is constitutional, the Defendant must clearly and convincingly show that:
[he] is exceptional, which in this context means that because of unusual circumstances this Defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.
Id. at 676, 677. (Citations omitted).
In affirming the Defendant's conviction and mandatory sentence in Lindsey, the Louisiana Supreme noted:[20]
In fact, he is exactly the type of offender that the Habitual Offender Statute intends to punish so severely. He is *1077 sentenced to life imprisonment because he continues to commit felony after felony. The fact that his last felony was the only violent crime against a person is not an "unusual circumstance" that would support a downward departure. A person with three prior non-violent felony convictions who then proceeds to commit a felony involving violence against a person has shown that his criminal conduct is becoming worse. The goals of the Habitual Offender Statute, to deter and punish recidivism, are satisfied by imposing a life sentence against such a person.
Lindsey, 770 So.2d at 344.
At the sentencing hearing, the Defendant did not argue for downward departure from the mandatory minimum sentence in his case. He did not present any evidence, much less clear and convincing evidence, sufficient to rebut the presumption that the mandatory minimum sentence mandated by the legislature is constitutional. In addition, the Defendant was found to be a habitual felony offender with an underlying felony drug conviction. According to Lindsey, the Defendant in this case is "exactly the type of offender that the Habitual Offender Statute intends to punish so severely."
While the Defendant claims that he was not the worst type of offender and his was not the worst type of offense, the State read his rap sheet entailing nine prior felony convictions at the Defendant's original sentencing. At that time, the trial judge stated:
Mr. Decay, stand up.
I have listened to your rap sheet, Mr. Decay, and I've also presided over the trial in which you were found guilty on these three counts.
I'm particularly aware of the fact that you were convicted in Judge Sullivan's court of the conspiracy to commit a bribe of a public official, namely a D.A. investigator.[21] That, to me, is as serious as your other offenses, because with that conviction, it established that you tried to subvert and destroy the confidence of the criminal justice system, the D.A.'s office, the Judiciary, and all other aspects of the system. I find that most grievous ...
(R., p. 972).
Consequently, we find no merit in the Defendant's assertion that he is not the type of offender that should be given the minimum mandatory sentence. Furthermore, he failed to produce any evidence that would rebut the presumption of constitutionality of the minimum sentence as required by State v. Johnson, 709 So.2d at 676. Finally, although the Defendant complains that the trial judge failed to articulate reasons for sentence, it was unnecessary for the trial judge to do so because this sentence was mandatory. State v. Windham, 99-637 (La.App. 5th Cir.11/30/99), 748 So.2d 1220, 1224 (citing State v. Haynes, 98-588 (La.App. 5th Cir.2/23/99), 729 So.2d 104, 109). Thus, we find that the trial court did not abuse its wide discretion in imposing the mandatory minimum sentence on the Defendant and, further, we find that the sentence was not excessive.

ERROR PATENT DISCUSSION
We have reviewed the record for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Perrilloux, 99-1314 (La.App. 5th Cir.5/17/00), 762 So.2d 198, 206. We find an error requiring a remand.
*1078 During the habitual offender proceeding, there was some uncertainty as to the numbers of felonies being used to enhance the sentence. After the trial judge inquired, the State clarified that it alleged that the Defendant was a third felony offender. However, the trial judge did not state that he found Defendant to be a third felony offender. The trial judge stated that the Defendant was a "multiple offender under the statute.". Pursuant to State v. Jones, 516 So.2d 396, 402 (La.App. 5th Cir.1987), since the trial judge failed to specify that the Defendant was a third felony offender, the sentence is defective because it is not determinate.[22] Thus, we will vacate the sentence and remand the case for a determination of the number of felonies proven by the State and for resentencing following that determination.[23]
Accordingly, the Defendant's convictions and two sentences for attempted possession of over 400 grams of cocaine and carrying an illegal weapon by a convicted felon are hereby affirmed. The finding as a "multiple offender under the statute" and enhanced sentence are vacated and the case is remanded.
CONVICTIONS AND SENTENCES FOR ATTEMPTED POSSESSION AND CARRYING AN ILLEGAL WEAPON AFFIRMED, MULTIPLE OFFENDER FINDING AND ENHANCED SENTENCE VACATED, CASE REMANDED.
ROTHSCHILD, J., DISSENTS IN PART.
NOTES
[1] See also the companion case, State v. Richardson, 00-KA-1551, which is also on appeal before the same panel on the same docket and involves similar issues.
[2] In his written motion to suppress, the Defendant argued that the evidence should be suppressed since it was seized without a valid warrant or a valid exception to the warrant requirement.
[3] The hearings were held on March 26, 1999, April 21, 1999, May 14, 1999, May 28, 1999, July 16, 1999, July 30, 1999, September 10, 1999, October 21, 1999, January 28, 2000, and February 18, 2000. Some of these hearings were held prior to the Defendant's trial attorney's involvement in the case. But see discussion in Assignment of Error No. 2.
[4] On September 25, 2000, the Defendant filed a motion to recuse the district attorney, arguing that the district attorney had a personal interest in prosecuting these charges against him since he had recently been convicted of conspiracy to commit public bribery for his involvement in attempting to pay Assistant District Attorney Joseph Roberts to drop pending drug charges against him. On July 10, 2001, a panel of this Court heard the Defendant's appeal of that conviction in State v. Decay, 01-KA-0121 (La.App. 5 Cir. 2001), 798 So.2d 339.
[5] The charges arose from information obtained from wire taps on the telephones of Defendant and two other individuals:

a. Terry England, wire taps from March 16, 1998April 28, 1998'
b. the Defendant, wire taps from May 28, 1998June 8, 1998;
c. John Esteen, wire taps from June 8, 1998June 23, 1998.
[6] A pen register is a computer printout of telephone numbers which called or were called from the number being monitored. State's Exhibit 1-A was introduced at the March 26, 1999 suppression hearing. (Supp. R., p. 218).
[7] The issues are raised by the Defendant in this case only pertain to the wiretap on his home telephone line. A review of the four volume record and three volume supplement reveals that there were at least two other wiretaps, which led to arrests of other defendants named in the racketeering count of the bill of information of this case. Because the issues that the Defendant raises on appeal do not concern those wiretaps, the details of those wiretaps are not discussed here.
[8] At the March 26, 1999 hearing on the motion to suppress the wiretap evidence, there was testimony from Judge McManus, Agent Pearson, Trooper Schmidt, and Assistant District Attorney Kia Habisreitinger about the integrity of the seal on another box of tapes marked for evidence as Exhibit S-4U. (R. in 00-KA-1551, pp. 124-133, 141-151, 155-168, 169-197). However, the integrity of the seal on Exhibit S-1M, the box of tapes of the Defendant's telephone which are at issue in this appeal, was not in question because the trial judge noted that it was appropriately sealed.
[9] On August 15, 2000, the Louisiana Supreme Court appointed retired Judge Walter Kollin ad hoc to preside over the Defendant's trial in this matter. Judge Grant, however, was not deprived of her authority to rule on pre-trial matters, including motions to suppress, in this case.
[10] With respect to the Defendant's wiretap evidence, the several defendants argued, among other things, that each individual audiotape was not enclosed in either a plastic holder or envelope, that the proper law enforcement agent did not properly seal each tape, and that each tape should be sealed with red evidence tape. (R., pp. 123-134, 135-151, 152-167).
[11] Quoting State v. Bass, 595 So.2d 820, 823 (La.App. 2nd Cir.1992) writ denied, 598 So.2d 373 (La.1992).
[12] The Defendant also quotes extensively from State v. Cain, 95-0054 (La.App. 4th Cir.2/27/96), 670 So.2d 515, 519-521. Cain is factually similar to Ojeda Rios. In Cain, the order expired and there was a delay of between 109 and 136 days in having the tapes judicially sealed. Id. at 522. Because the delay occurred after the wiretap authorization had expired, Cain, like Ojeda Rios, is distinguishable from this case in regard to this issue.
[13] Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq.
[14] See footnote 9, supra.
[15] The affidavit is attached to the opinion.
[16] Other affiants were Jefferson Parish District Attorney Paul Connick, Colonel W.R. Whittington of the LSP and Assistant State Attorney General Timothy Screen.
[17] According to the record, the Defendant was in federal custody in Memphis, Tennessee during the initial stages of this criminal proceeding. After the Defendant's presence was secured, an attorney was appointed to represent him and both were present for the September 10, 1999 suppression hearing.
[18] See subsequent unrelated history, State v. Lobato, 621 So.2d 103, (La. 2nd Cir.1993) and State v. Lobato, 627 So.2d 644 (La.1993).
[19] According to La.R.S. 40:967(F), the Defendant's underlying felony conviction, possession of more than 400 grams of cocaine, is punishable by imprisonment for not less than 30 nor more than 60 years at hard labor and a substantial fine.
[20] In Lindsey, the defendant was found to be a fourth felony offender and sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. His underlying felony was simple robbery, which is a crime of violence. His three predicate offenses were felonies, but not enumerated as crimes of violence.
[21] The Defendant was convicted of conspiracy to bribe Assistant District Attorney Joe Roberts. See footnote 4, supra.
[22] Compare State v. Gaines, 97-672 (La.App. 5th Cir.2/25/98), 707 So.2d 1354, 1359. There, the panel, did not remand since the defect was favorable to Defendant and neither the State nor the Defendant had raised the defect on appeal. The instant case is distinguishable because the defect does not favor the Defendant since the trial judge sentenced Decay to life imprisonment, the harshest available sentence.
[23] We note two other errors that the trial judge can remedy after resentencing. First, the commitment is inconsistent with the minute entry. Although the transcript of the enhanced sentencing hearing reflects that the trial judge vacated the Defendant's original sentence on only one count of his original three counts, the minute entry/commitment reflects that "the original sentence is vacated and set aside". The commitment following resentencing should accurately reflect the transcript.

Second, the trial judge failed to inform the Defendant when he was originally sentenced, or when he was sentenced as a multiple offender, of the prescriptive period of two years from the date the conviction becomes final for applying for post-conviction relief, as required by La.C.Cr.P. art. 930.8. Although the Louisiana Legislature amended article 930.8, effective on August 15, 1999, to shorten the prescriptive period from three to two years, the application of the amended prescriptive period in this case does not violate ex post facto prohibitions because article 930.8 does not relate to an offense or its punishment. State v. Windham, 748 So.2d at 1225. Following re-sentencing the trial judge should correctly inform the Defendant of the provisions of La.C.Cr.P. art. 930.8 in order to avoid a future patent error.